<u>DOCUMENT ELECTRONICALLY FILED</u>

Courtesy Copy

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert B. Kugler |
| | : | |
| v. | : | Crim. No. 07-459 (RBK) |
| | : | |
| MOHAMAD IBRAHIM SHNEWER, | : | |
| DRITAN DUKA, | : | |
| a/k/a "Tony Duka," | : | |
| ELJVIR DUKA, | : | |
| a/k/a "Sulayman," | : | |
| SHAIN DUKA, | : | |
| a/k/a "Shaheen," and | : | |
| SERDAR TATAR | : | |

---

UNITED STATES' OPPOSITION TO DEFENDANT SHNEWER'S MOTION FOR
CHANGE OF VENUE

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street
Newark, New Jersey 07102

On the Memorandum:

William E. Fitzpatrick
Deputy United States Attorney
Michael Hammer
Norman Gross
Assistant United States Attorneys
John VanLonkhuyzen
Trial Attorney
Counterterrorism Section
United States Department of Justice
Camden Federal Building &
  U.S. Courthouse
401 Market Street, 4th Floor
Camden, New Jersey 08101
(856) 757-5030

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

    A.    DEFENDANTS BEAR A HEAVY BURDEN OF SHOWING
           PRE-*VOIR DIRE* PRESUMPTIVE PREJUDICE . . . . . . . . 2

    B.    DEFENDANTS HAVE FAILED TO SUSTAIN THEIR HEAVY
           BURDEN OF SHOWING, BEFORE *VOIR DIRE* EVEN
           BEGINS, THAT SELECTING AN IMPARTIAL JURY WILL
           BE IMPOSSIBLE HERE . . . . . . . . . . . . . . . . 5

           1.    DEFENDANTS DO NOT EVEN ATTEMPT TO SHOW THAT
                 TRANSFER TO ANOTHER VICINAGE WOULD PRODUCE
                 A LESS PARTIAL JURY . . . . . . . . . . . . . . 5

           2.    THE BOCHNAK REPORT SUFFERS FROM OTHER FLAWS . . 8

           3.    NATIONAL MEDIA ATTENTION TO THIS CASE
                 UNDERMINES THE LIKELIHOOD OF OBTAINING A
                 LESS "BIASED" VENIRE IN ANOTHER VICINAGE . . . 20

           4.    THE PASSAGE OF SIXTEEN MONTHS BETWEEN THE
                 MAY 2007 ARRESTS IN THIS CASE, WHEN
                 PUBLICITY PEAKED, AND THE SEPTEMBER 2008
                 TRIAL HAS AND WILL CONTINUE TO DIMINISH
                 ANY PREJUDICE . . . . . . . . . . . . . . . . . 21

           5.    DEFENDANTS DO NOT PURPORT TO SHOW THAT
                 NEWS REPORTS HAVE DISCLOSED INADMISSIBLE
                 AND PREJUDICIAL EVIDENCE . . . . . . . . . . . 23

           6.    DEFENDANTS' MOTION IS AT BEST PREMATURE . . . 24

           7.    GIVEN DEFENDANTS' FAILURE TO MEET THEIR
                 BURDEN, TRANSFER OF THIS CASE WOULD WORK
                 AN UNWARRANTED BURDEN ON THE COURT AND
                 THE PROSECUTION . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

### CASES

Coleman v. Kemp,
    778 F.2d 1487 (11th Cir. 1985) . . . . . . . . . . . . . . 3

Dobbert v. Florida,
    432 U.S. 282 (1977) . . . . . . . . . . . . . . . . . . . 3, 8

Estes v. Texas,
    381 U.S. 532 (1965) . . . . . . . . . . . . . . . . . . . . 29

Flamer v. State of Delaware,
    68 F.3d 736 (3d Cir. 1995) . . . . . . . . . . . . . . . . . 4

Irvin v. Dowd,
    366 U.S. 717 (1961)] . . . . . . . . . . . . . 4, 5, 27, 29

Kontakis v. Beyer,
    19 F.3d 110 (3d Cir. 1994) . . . . . . . . . . . . . . . . 4

Martin v. Warden, Huntingdon State Correctional Institute,
    653 F.2d 799 (3d Cir. 1981) . . . . . . . . . . . . . . . 27

Mu'Min v. Virginia,
    500 U.S. 415 (1991) . . . . . . . . . . . . . . . . . . . 24

Murphy v. Florida,
    421 U.S. 794 (1975) . . . . . . . . . . . . . 9, 16, 17, 21

Nebraska Press Association v. Stuart,
    427 U.S. 539 (1976) . . . . . . . . . . . . . . . . . . . . 2

Patton v. Yount,
    467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . 21, 24

Rideau v. Louisiana,
    373 U.S. 723 (1963) . . . . . . . . . . . . . . . . . . . 29

Rock v. Zimmerman,
    959 F.2d 1237 (3d Cir. 1992) . . . . . . . . . 4, 19, 22, 28

Sheppard v. Maxwell,
    384 U.S. 333 (1966) . . . . . . . . . . . . . . . . . . . 29

United States v. Abrahams,
    453 F. Supp. 749 (D. Mass. 1978) . . . . . . . . . . . . . 29

United States v.  Bailey,
     112 F.3d 758 (4th Cir. 1997)  . . . . . . . . . . . . . . . . 2

United States v. Bakker,
     925 F.2d 728 (4th Cir. 1991)  . . . . . . . . . . . 5, 8, 10

United States v. Campa,
     459 F.3d 1121 (11th Cir. 2006)  . . . . . . . . 2, 3, 19, 29

United States v. Capo,
     595 F.2d 1086 (5th Cir. 1979) . . . . . . . . . . 4, 22, 23

United States v. Chapin,
     515 F.2d 1274 (D.C. Cir. 1975)  . . . . . . . . . 4, 28, 29

United States v. De La Vega,
     913 F.2d 861 (11th Cir. 1990) . . . . . . . . . . . . . . . 9

United States v. De Peri,
     778 F.2d 963 (3d Cir. 1985) . . . . . . . . . . 3, 4, 11, 15

United States v. Faul,
     748 F.2d 1204 (8th Cir. 1984) . . . . . . . . . . . . . . 27

United States v. Flores-Elias,
     650 F.2d 1149 (9th Cir. 1981) . . . . . . . . . . . . . . . 4

United States v. Lindh,
     212 F. Supp. 2d 541 (E.D. Va. 2002) . . . . . 6, 7, 10, 16, 28

United States v. McVeigh,
     153 F.3d 1166 (10th Cir. 1998)  . . . . . . . . . . . . . . 2

United States v. McVeigh,
     918 F. Supp. 1467 (W.D. Okla. 1996) . . . . . . . . . 4, 30

United States v. Provenzano,
     620 F.2d 985 (3d Cir. 1980) . . . . . . . . . . . . . . . . 3

Wansley v. Slayton,
     487 F.2d 90 (4th Cir. 1973) . . . . . . . . . . . . . . . . 3

## RULES

Fed. R. Crim. P. 21(a) . . . . . . . . . . . . . . . . 1, 2

N.J. Local Crim. R. 101.1 . . . . . . . . . . . . . . . 23

## CONSTITUTION

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . 2

## INTRODUCTION

Defendant Mohamad Ibrahim Shnewer, joined by the other four defendants, moves to transfer the trial in this case from this District to "who knows where." The motion relies heavily on the flawed report by defendants' jury consultant, Beth Bochnak (the "Bochnak Report") that is most notable for what it does not say.

For instance, the Bochnak Report does not identify any other district where, in Ms. Bochnak's opinion, the defendants might face less supposedly "prejudicial" pre-trial publicity than in this vicinage. Although the Bochnak Report describes newspaper stories about this case, it fails to establish the percentage of potential jurors from this vicinage who have been exposed to those stories. Additionally, Ms. Bochnak analyzes some of the newspaper coverage from only May to December 2007, and omits any discussion of the coverage during the six months since then. In short, Ms. Bochnak and the defendants have utterly failed to sustain their heavy burden under Fed. R. Crim. P. 21(a) of showing that, even before *voir dire* begins, "impartiality is impossible and prejudice must be presumed." Mohamad Shnewer Brief In Support Of Motion For Change of Venue ("MSB"), Docket 169-2, p. 4. This Court should therefore deny defendants' transfer motion.

1

**ARGUMENT**

**A.    DEFENDANTS BEAR A HEAVY BURDEN OF SHOWING PRE-*VOIR DIRE*
PRESUMPTIVE PREJUDICE.**

The Sixth Amendment guarantees that in all criminal
prosecutions, the defendant shall enjoy the right to trial "by an
impartial jury." U.S. Const. amend. VI.  To effectuate that
right, Fed. R. Crim. P. 21(a) provides that:

> Upon the defendant's motion, the court must transfer
> the proceeding . . . to another district if the court
> is satisfied that so great a prejudice against the
> defendant exists in the transferring district that the
> defendant cannot obtain a fair and impartial trial
> there.

Fed. R. Crim. P. 21(a).  "The well established rule vests
substantial discretion in the district court as to the granting
or denying of a motion for transfer." United States v. Campa,
459 F.3d 1121, 1146 (11th Cir. 2006) (internal citation omitted).

Transfer under Rule 21(a) is not mandated merely because a
case has generated substantial pre-trial publicity, because
"pretrial publicity -- even pervasive, adverse publicity -- does
not inevitably lead to an unfair trial." Nebraska Press Ass'n v.
Stuart, 427 U.S. 539, 554 (1976).  Pre-trial publicity requires a
change of venue in only two circumstances: when the publicity is
of such a nature that impartiality is impossible and prejudice
must be presumed; and when *voir dire* discloses actual prejudice
resulting from the publicity. See, e.g., United States v.

2

McVeigh, 153 F.3d 1166, 1179 (10th Cir. 1998); United States v. Bailey, 112 F.3d 758, 769 (4th Cir. 1997).

The "burden of establishing prejudicial pre-trial publicity rests on him who asserts it." Wansley v. Slayton, 487 F.2d 90, 94 (4th Cir. 1973).[1]  The burden is a "heavy one" because "the presumed prejudice principle is rarely applicable and is reserved for an extreme situation." Campa, 459 F.3d at 1143 (internal quotation marks omitted).  See also United States v. De Peri, 778 F.2d 963, 971-72 (3d Cir. 1985)("It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurance that they can be impartial.") (citing United States v. Provenzano, 620 F.2d 985, 995 (3d Cir. 1980)).  The mere fact that community members are cognizant of the crimes and of the defendants' identities does not, by itself, render the trial constitutionally unfair.  See Dobbert v. Florida, 432 U.S. 282, 303 (1977).  Instead, the court must examine the "the totality of the circumstances surrounding the trial for the conjunction of extensive and inflammatory publicity immediately prior to trial, evidence of the community's

---

[1]  Accord, Coleman v. Kemp, 778 F.2d 1487, 1537 (11th Cir. 1985); see generally Dobbert v. Florida, 432 U.S. 282, 303 (1977) ("unfairness of constitutional magnitude" will not be presumed "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage'") (quoting Murphy v. Florida, 421 U.S. 794, 798 (1975)).

outrage at the revelation of the crimes, and clear indications of juror partiality on the record." See De Peri, 778 F.2d at 972.

Given that burden, transfers of venue based on pre-trial publicity are rarely granted, as "the effects of pre-trial publicity on the pool from which jurors are drawn is [generally] determined by a careful and searching voir dire examination." United States v. McVeigh, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996).[2] "[I]t is not required . . . that jurors be totally ignorant of the facts and issues involved." Irwin v. Dowd, 366 U.S. 717, 722-23 (1961). Rather, "[i]t is sufficient if the

_____

[2] Confirmation of this proposition can be found in the cases cited by the defendants themselves, in which the denials of transfer motions were routinely affirmed. E.g., Flamer v. State of Delaware, 68 F.3d 736, 754-55 (3d Cir. 1995) ("The record in this case falls far short of satisfying the Irvin [v. Dowd, 366 U.S. 717, 723 (1961)] standard," where newspaper articles "were indisputably factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime"); Rock v. Zimmerman, 959 F.2d 1237, 1254 (3d Cir. 1992)(habeas case, trial court did not err by denying pre-trial transfer motion based on pre-trial publicity), overruled on other grounds as recognized by Kontakis v. Beyer, 19 F.3d 110, 116, n.9 (3d Cir. 1994); United States v. Flores-Elias, 650 F.2d 1149 (9th Cir. 1981)(affirming the denial of a transfer motion where "the publicity was largely factual, not emotional or accusatory"); United States v. Capo, 595 F.2d 1086, 1091 (5th Cir. 1979) ("appellants were [not] subjected to prejudicial publicity of such a magnitude that it dominated the proceedings and reduced the trial to a mockery of justice"); United States v. Chapin, 515 F.2d 1274, 1288 (D.C. Cir. 1975) (affirming the denial of a pre-trial motion to transfer the prosecution of a former Nixon Administration official from Washington, D.C., even though the trial took place in between the Senate Watergate hearings and the Nixon impeachment proceedings, where press coverage of the Watergate scandal was at its peak).

juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." United States v. Bakker, 925 F.2d 728, 732 (4th Cir. 1991). See also Irvin v. Dowd, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

**B. DEFENDANTS HAVE FAILED TO SUSTAIN THEIR HEAVY BURDEN OF SHOWING, BEFORE *VOIR DIRE* EVEN BEGINS, THAT SELECTING AN IMPARTIAL JURY WILL BE IMPOSSIBLE HERE.**

**1. DEFENDANTS DO NOT EVEN ATTEMPT TO SHOW THAT TRANSFER TO ANOTHER VICINAGE WOULD PRODUCE A LESS PARTIAL JURY.**

Defendants' transfer motion suffers from a number of crucial omissions. First and foremost, defendants do not identify another vicinage that, even in their view, would produce a less biased venire than this one. Ms. Bochnak did not survey a random sample (or indeed any sample) of potential jurors drawn from this vicinage, or survey a random sample (or any sample) of persons from some other vicinage to which defendants seek to have this case transferred for trial. Accordingly, she cannot show whether

another vicinage contains a higher percentage of "unbiased" potential jurors than this vicinage.[3]

Rather, the Bochnak Report focuses almost entirely upon a content analysis of stories published by four newspapers which distribute their papers in this vicinage, and some Internet postings by persons who responded to those stories.  But Ms. Bochnak did not compare those newspaper stories, in either extent or content of coverage, with newspaper coverage in other possible venues.  This failure is in marked contrast to much more extensive efforts undertaken in another recent case involving charges of jihadist inspired terrorism, where the defendant presented both comparative polling data and a comparison of newspaper coverage for different vicinages, and still failed to meet his burden that transfer was appropriate.  United States v. Lindh, 212 F. Supp. 2d 541 (E.D. Va. 2002).[4]

---

[3]  Although Ms. Bochnak does refer to surveys conducted by persons other than herself regarding negative attitudes towards Muslims, Bochnak Report, ¶ 7 and Table 4, those surveys were evidently directed to a nationwide sample of persons, and so offer no guidance about whether persons in this vicinage are more biased against Muslims in general, or these defendants in particular, than are persons in any other judicial district.

[4]  The defense survey in Lindh asked respondents: (i) what information they know about Lindh; (ii) whether they have a strongly favorable, somewhat favorable, somewhat unfavorable or strongly unfavorable opinion of Lindh; (iii) whether they view Lindh as a terrorist, a traitor, a confused young man or a person on a religious journey; (iv) whether they believe Lindh was involved in the death of a CIA agent; (v) whether they believe there was a connection between Lindh and the September 11, 2001
(continued...)

Had Ms. Bochnak conducted such a comparative study here, she might have found that the defendants were "just as likely to receive a fair trial in this district as [they would] elsewhere in the country," and that "the stated attitudes of jury eligible respondents in [this district towards the defendants] did not differ from stated attitudes in the rest of the country." Lindh, 212 F. Supp. 2d at 550.[5] But defendants, who merely ask that the case be transferred out of the Camden vicinage, MSB at 2, do not even propose an alternate venue in which the prospective jurors were not exposed to the magnitude of publicity that occurred in

---

[4](...continued)
terrorist attacks; (vi) whether they knew someone who was killed or injured in the September 11, 2001 terrorist attacks; (vii) whether they believe Lindh is guilty, probably guilty, probably not guilty or definitely not guilty of the charges against him; (viii) whether they would consider a not guilty verdict very acceptable, acceptable, not acceptable or very unacceptable; (ix) what punishment they believe Lindh should receive if found guilty of the charges against him; and (x) whether they could be fair and impartial if seated as a juror at Lindh's trial. 212 F. Supp. 2d at 550, n. 8.

[5] In Lindh, notwithstanding the similar if not more saturated media coverage of a defendant who was accused of actually killing a United States official on behalf of al Qaeda, "approximately three quarters (74%) of the Northern Virginia residents who were polled indicated that they could be fair and impartial if seated as a juror at Lindh's trial" which was a higher number than in one of the districts to which Lindh sought a transfer. 212 F. Supp. 2d at 550. "The fact that [some prospective jurors] knew someone injured or killed in the September 11, 2001 terrorist attacks" or knows people who work or have occasion to visit the Ft. Dix facility "does not warrant . . . a change of venue [since] such personal connections to the terrorist attacks are matters adequately addressed and dealt with during the voir dire process." Id. at 550-51.

this vicinage, much less demonstrate that the venire in another vicinage will be less biased against the defendants than a venire selected here.  Because defendants have not identified another district in which the venire would likely be less biased than one selected in this district, they have failed to sustain their burden of showing there is a more suitable district for the trial of this case.  Their motion should therefore be denied.

## 2.    THE BOCHNAK REPORT SUFFERS FROM OTHER FLAWS.

There are numerous other reasons to discount Ms. Bochnak's conclusion that this Court will be unable to impanel a fair and impartial jury.

**First**, the Bochnak Report is devoted largely to a collection and description of newspaper stories published by four newspapers with subscribers in this vicinage: the <u>Philadelphia Inquirer</u>, the <u>Courier-Post</u>, the <u>Press of Atlantic City</u>, and the <u>Burlington County Times</u>.  MSB 7.[6]  But defendants cannot meet their burden

---

[6]  The Bochnak Report describes a total of 236 newspaper stories published by those entities from May through December 2007.  MSB 7.  Table 1 of the Report compares the number of stories about this case with the number of stories about other hot topics only during the week of May 6-11, 2007, when interest in this story was at its peak.  The Report does not identify the number of stories published by the subject newspapers about other heavily-covered topics that occurred during the entire time period covered by the Report, such as the United States Presidential primary elections, the war in Iraq, and the rise in gasoline prices.  In any event, "[s]heer volume of publicity alone does not deny a defendant a fair trial."  <u>Bakker</u>, 925 F.2d at 732 (citing <u>Dobbert v. Florida</u>, 432 U.S. 282, 303 (1977)).

of establishing the "impossibility of a fair trial" merely by digesting newspaper articles.  If the bulk of the media reports of a criminal case contain neutral accounts of purely factual information, and do not traffic in emotional diatribes, the reports are unlikely to poison the venire pool.  See Murphy v. Florida, 421 U.S. 794, 801 n. 4 (1975).  For that reason, a Court addressing a Rule 21(a) motion must distinguish between factual and inflammatory pre-trial publicity, as it is chiefly the latter that is fraught with the potential for poisoning the venire. Id.; United States v. De La Vega, 913 F.2d 861, 865 (11th Cir. 1990) (ruling that the 330 articles submitted by the defendants were largely factual and could not have created an inflamed community atmosphere sufficient to presume prejudice in the Miami-Dade community of 1.8 million people).[7]

Defendants identify several Internet postings that are plainly hostile against the defendants, Bochnak Report, ¶ 10.[8]

---

[7] The Bochnak Report runs headlong against this law when it states that "the continued recitation of 'facts' or 'evidence' in the press or on TV - generally in the form of summaries of the case, interviews of law enforcement, or other persons frequently results in potential jurors forming such strong opinions about the guilt of the accused."  Bochnak Report, ¶ 9.

[8] Although defendants spend much time quoting from Internet postings and letters to the editor from persons who express their loathing for the defendants, the consequences of such animus for this motion are minimal, at best.  First, Ms. Bochnak does not purport to show that any of the persons who publicly spewed hatred against the defendants in particular, or against persons of Muslim faith in general, live in this vicinage.  Second, as

(continued...)

But "on the whole, the record does not warrant a conclusion that
prejudicial pre-trial publicity has been so 'inherently
prejudicial that trial proceedings must be presumed to be
tainted' or that [defendants] cannot receive a fair trial."
Lindh, 212 F. Supp. 2d at 549; quoting Bakker, 925 F.2d at 732.[9]

Defendants characterize the newspaper articles that they
have selected as "overwhelmingly negative toward the defendants,"
and contend that the "few articles" containing "statements of

_____

[8] (...continued)
defendants concede, the persons who would take the time and
trouble to spout such animosity are a self-selected group of
persons who represent only the fringe from which a fair and
impartial jury cannot be selected.

The existence of such opinions says little if anything about
the ability of the Court to keep anyone with those or similar
views off the jury and to select a jury of persons holding very
different views. Although Ms. Bochnak contends that "interest
prejudice" adverse to the defendants may arise among persons who
have some connection to Ft. Dix or to the terrorist attacks on
September 11, 2001, Bochnak Report, ¶ 8, such persons can be
readily excluded during voir dire. Because this case has
generated more publicity than most, and because this Court will
summon a very large number of venire persons from which to select
the petite jury, problems relating to "interest prejudice" and
"specific prejudice" against these defendants, MSB 20-34 can be
alleviated with a more liberal standard for challenges for cause.

[9] Ms. Bochnak complains that the anonymous jury procedure
in this case will somehow impede the defendants' ability to
determine if any of the persons who made the inflammatory
Internet postings are in the venire pool. Bochnak Report, ¶ 10.
This assertion overlooks the fact that none of the persons who
posted those statements used their actual names: all used
nicknames such as "nerd," "hulk," "ipsychi," "eagle," "camden
beer," and "opinionated13." Id. Thus, even if the anonymous
jury procedure was not used, defendants would be no better off in
determining whether any of those persons are in the venire pool.

innocence from defendants or their attorneys have contained much that is negative." MSB 9. To the contrary, many of the newspaper articles identified by defendants are largely recitations of neutral facts regarding the initiation of charges and proceedings in the case, which has little if any likelihood to inflame prospective jurors against the defendants.[10] Others contained information that was, if anything, helpful to the defense, such as stories that quoted defense counsel in this case, and/or other persons who are sympathetic to the defense, contained favorable accounts of the defendants by their neighbors, or described a prosecution cooperating witness in a negative light.[11] By comparison, only a relatively few contained commentary and opinion that could be construed as hostile to the defendants.[12] See De Peri, 778 F.2d at 972 ("Although the pre-trial publicity was extensive, and there was no 'cooling off' period between the publicity and trial . . . we find a lack of

---

[10] E.g., Docket 169-4, pp. 7, 11-14, 35, 46-49, 55-63, 67-69; Docket 169-5, pp. 9-10, 13; Docket 169-6, pp. 34-45; Docket 169-7, pp. 1-2, 6-11, 14-17, 43; Docket 169-8, pp. 14-15, 20-27, 30-38, 48; Docket 169-9, pp. 18-19, 53; Docket 169-10, pp. 4-12, 15-16, 20, 22; Docket 169-11, pp. 22-23; Docket 169-12, pp. 1-2; Docket 169-13, pp. 1-2; Docket 169-15, pp. 1-3.

[11] E.g., Docket 169-4, pp. 15, 19, 23-26; Docket 169-5, pp. 3-5, 11-12, 33-34; Docket 169-6, pp. 4-6, 10-12; Docket 169-7, pp. 19-20, 24; Docket 169-8, pp. 12; Docket 169-11, pp. 19-20; Docket 169-14, pp. 2-4.

[12] E.g., Docket 169-5, pp. 30-32, 35, 55; Docket 169-8, pp. 62-63; Docket 169-10, p. 25; Docket 169-11, pp. 1, 8, 12, 18.

inflammatory, sensational journalism that would lead us to question the jury's impartiality.").

Contrary to the defense claims that the publicity about this case has been one-sided, there have been a host of stories that contain statements that are favorable towards the defendants;[13] place a key cooperating witness for the United States in an

_____

[13]   See, e.g.:

- Exhibit A hereto, Courier Post, May 11, 2007, "Terror Suspects' Lawyer, Loved Ones Arrive At Court" (noting that "[t]he suspects do not fit the prevailing image of terrorists" because they "worshiped at moderate mosques," "have family members close by," and "worked in blue collar jobs installing roofs, driving a cab, delivering pizzas, and baking bread");

- Exhibit B, Philly.com, May 13, 2007, "A Radical Shift in Reputation For 6 Men" (noting that relatives referred to the Duka brothers as "good boys"; that they were "just regular boys flirting with girls," "they were funny," neighbor describing Dritan Duka as a "great kid," and as "sensible, bright;" neighbors described the Dukas as "friendly and, while certainly of a different ethnic background, hardly disruptive" who gave away home grown produce to their neighbors; "they seemed like normal people";

- Exhibit C, Courier Post, May 16, 2007, "Brothers Worked In Construction Jobs" (describing a realtor's statements that the Dukas were "always more than happy to take . . . work" in their roofing business, no matter how small the job, and that they were "quiet, but conscientious" and "dependable," "polite," "they were clean, they did the job and they left";

- Exhibit D, Philly.com, May 21, 2007, "Terror-plot Defense: Evidence, Not Emotion" (noting that Tatar had disclosed information about the plot to FBI agents, and quoting one person's statement that the videos of the defendants engaged in firearms practice showed them merely "goofing off," and "riding horseback . . . Were they going to attack Fort Dix on horseback?").

unfavorable light;[14] or quote defense counsel making statements intended to advance the defense "theory" of the case, including claims of entrapment.[15]  For instance, a story in _Time_ magazine,

---

[14] See, e.g.:

- Exhibit A, _Courier Post_, May 11, 2007, "Terror Suspects' Lawyer, Loved Ones Arrive At Court" (attorney for defendant Shnewer noting "the role of paid informants and how aggressive they were in potentially prodding or moving things along");

- Exhibit E, _Philly.com_, November 27, 2007 "AP NewsBreak: Informant In Fort Dix Case Linked To Bank Fraud" (stating that Mahmoud Omar was indicted in June 2001 and charged with bank fraud, pled guilty, and received a reduced sentence of "only six months"; Omar admitted that he "double-crossed" a co-conspirator in that case);

- Exhibit F, Associated Press, November 28, 2007, "Witness in Fort Dix Linked To Fraud";

- Exhibit G, _Philly.com_, December 3, 2007, "Fort Dix Informant Named";

- Exhibit H, _The Star-Ledger_, May 11, 2007, "Lawyer: Fed's Informant Is 'Bad News'" (according to Mr. Archie, the witness "once landed in hot water for lying to the FBI" and "has a criminal record beyond what prosecutors have acknowledged");

- Exhibit J, _The Star-Ledger_, November 28, 2007, "Informant In Ft. Dix Terror Case Defrauded Bank, A Lawyer Notes."

[15] See, e.g.:

- Exhibit E, _Philly.com_, November 27, 2007 "AP NewsBreak: Informant In Fort Dix Case Linked To Bank Fraud" ("The actions of CW-1 have raised questions of whether the government crossed the line and pushed the six men down a path they would not have otherwise followed.");

- Exhibit G, _Philly.com_, December 3, 2007, "Fort Dix Informant Named" ("The defense attorneys are likely to argue that Omar
(continued...)

dated January 14, 2008, claimed that "a professional handwriting analysis of the [Eljvir Duka's letter regarding jihad] . . . casts serious doubt on it's authenticity."[16]  Ms. Bochnak's interpretation of the relevant materials as being pervasively one-sided is incorrect and calls into doubt her ultimate conclusion that the Court will be unable to select a fair and impartial jury.

**Second**, in an attempt to demonstrate the influence of the supposedly inflammatory articles from the four newspapers that she has reviewed, Ms. Bochnak cites the circulation figures for those newspapers.  Bochnak Report, Table 3.  Those circulation figures, however, bear little relevance to this Court's inquiry. First, Ms. Bochnak does not state whether her circulation figures refer to the number of newspapers actually delivered to individual subscribers and actually sold by retailers, or to the presumably larger number of newspapers printed, which includes copies that are distributed to retailers and to entities that are

---

[15](...continued)
entrapped the defendants, and question his credibility and motivations", Mr. Archie stated that "This guy is the dredges of the earth.  We're going to rake him over the coals.");

- Exhibit H, <u>The Record</u>, May 11, 2007 (Mr. Cipparone stating that "There is often a mercenary motive [of government informants] to either embellish or move things in a way that continues to allow them to draw from the trough").

[16]   Exhibit K.

never sold or read.  Nor does she purport to capture the number
of newspapers in circulation that are distributed to persons
living outside of this vicinage from which the jurors will be
drawn, so her circulation numbers likely overstate how many
potential jurors were exposed to the quoted articles.  Indeed,
the bulk of the copies of the Philadelphia Inquirer are sold to
and read by persons outside of this vicinage; Ms. Bochnak does
not even purport to demonstrate how many were distributed in this
vicinage.  Id.  Thus, her report says little of value about the
impact of the Inquirer stories on the potential jurors in this
case.

    More tellingly, Ms. Bochnak does not purport to capture the
percentage of potential jurors from this vicinage who read any of
the newspapers that are the subject of her analysis.  In light of
recent reports of the declining number of persons who receive
their news from newspapers,[17] defendants cannot meet their
exacting burden based on the questionable assumption that most or

------

[17]  See New York Times, April 29, 2008, "Most Papers Again
Report Big Declines in Circulation." http://www.nytimes.com/
2008/04/29/business/media/29paper.html?r=1&oref=slogin; see also
CNN.com, March 2, 2004, "Entertainment: Young American's News
Source: Jon Stewart, http://www.cnn.com/2004/SHOWBIZ/TV/03/02/
apontv.stewarts.stature.ap:

    A poll released earlier [in 2004] by the Pew Research
    Center for the People and the Press found that 21
    percent of people aged 18 to 29 cited "The Daily Show"
    and "Saturday Night Live" as a place where they
    regularly learned presidential campaign news.

even many of the potential jurors in this vicinage had any exposure to the newspaper articles to which the bulk of the Bochnak Report is addressed.

**Third**, Ms. Bochnak contends that, in the context of this case, biased venire persons will not necessarily disclose their biases during *voir dire*. Bochnak Report, ¶ 12. But this assertion is contradicted elsewhere in her report, where Ms. Bochnak points to opinion surveys showing that a "significant number of Americans [nearly 40%, are] willing to admit they harbor at least some negative feelings of prejudice against Muslims." Bochnak Report, ¶ 7. Moreover, as one court has observed in rejecting a motion to transfer because of pre-trial publicity, "assertions of fairness and impartiality [by prospective jurors] are entitled to credence and are not lightly to be discarded." Lindh, 212 F. Supp. 2d at 551, n.10 (internal citation omitted); see also Murphy v. Florida, 421 U.S. 794, 803 (1975) (where "20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt . . . . it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.").

**Fourth**, Ms. Bochnak's report suffers from some obvious overstatements which she does not attempt to support with empirical data. For instance, she boldly proclaims that "[t]he

16

alleged plot to attack Fort Dix has been front page news since it occurred, in both the <u>Courier Post</u> and the <u>Philadelphia Inquirer</u> and has been on television news since May 8, 2007." Bochnak Report, ¶ 4. But she provides no data to show which of the stories described in her report appeared on the front page of those newspapers. This is a significant shortcoming, as people are more likely to be aware of "front page" stories than stories appearing in the back pages.

Likewise, the Bochnak Report is bereft of evidence regarding the frequency of stories about this case in any television program. At one point, her "analysis" is reduced to assertions based on "information and belief," Bochnak Report at ¶ 4. This is because her investigation was limited to information available on the Internet; she did not take the additional step of extending her research even to the libraries of the newspapers she purports to study. <u>Id.</u>

Ms. Bochnak's assertion that "the alleged plot against Fort Dix has inflamed the community," <u>id.</u>, ¶ 5, is likewise bereft of persuasive empirical support. Although she describes an attack on the sister of one of the defendants that was apparently motivated by the charges in this case, she has conducted not a

single survey to quantify the percentage of persons in the relevant community who have been "inflamed."[18]

Ms. Bochnak's assertion that the press coverage has been so extensive that "the community has been saturated with information about the case," Bochnak Report, ¶ 5, is also unsupported by any data.  Although she provides a figure for the gross number of stories about the case during the limited time period of May through December, 2007, she offers no relevant comparative statistics, such as the number of total stories in the four newspapers during the measured time period, or the total number of stories about criminal cases.  Thus, her assertions that there have been "236 articles," about the case and that the term "the Fort Dix Six" has been used 43 times merely recite numbers that have no contextual significance.

As shown above, Ms. Bochnak's assertion that "all of the news coverage has been negative towards the defendants," Bochnak Report, ¶ 5, is demonstrably false, by reference to her own data. To take one example, stories about the fact that one of the principal prosecution witnesses previously pleaded guilty to a

_____

[18]   The attack occurred in September 2007, a year before the scheduled start of the trial.  It was carried out by a middle school student at the school where the sister was also a student. That unfortunate incident is only lightly probative of whether the potential jurors in this case, all of whom will be adults, have been so inflamed by the press coverage that they will be unable to be fair and impartial one year after the attack occurred.

charge of fraud cannot possibly be described as "negative towards the defendants." See infra, footnote 15. To the contrary, that story is highly "negative towards the prosecution."

Ms. Bochnak makes other dubious assertions without referencing any supporting data. See Bochnak Report, ¶ 9 (claiming that jurors in highly publicized cases report in post-trial interviews that they claimed during voir dire that they did not recall media coverage during the case, but their memories "resurfaced" during trial; jurors have difficulty "sorting out" the information they learned during trial from the information they learned from other sources; jurors in the Camden vicinage will experience more difficulty with that "sorting" because of the greater volume of press coverage here than elsewhere). Although Ms. Bochnak apparently wants the Court to simply "take her word" for the accuracy of those assertions, her erroneous or unsupported assertions elsewhere in her report should cause the Court to view those claims with measured skepticism.

Given the evident shortcomings in the Bochnak Report, this Court should put little if any weight on its conclusions. See Rock v. Zimmerman, 959 F.2d 1237, 1253 (3d Cir. 1992) (district court appropriately had "grave doubts as to the reliability of the [defense] survey's methodology and results," which "purported to show that 93.7% of those interviewed had 'heard of' Rock's case, and that 68% of that group believed Rock to be guilty");

19

<u>Campa</u>, 459 F.3d at 1145-46 (affirming the denial of a Rule 21(a) transfer motion where the district court considered but permissibly accorded little weight to the results of the random survey of 300 registered Miami-Dade voters conducted by an academic, which was purportedly designed to examine prejudice against anyone alleged to have assisted the Cuban government in espionage activities, where the expert opined that "the only viable means of assuring the defendant a fair and impartial jury" was a transfer to another district; "It was entirely within the district court's prerogative to reject outright Professor Moran's survey as a basis upon which to grant a motion to change venue.").

### 3. NATIONAL MEDIA ATTENTION TO THIS CASE UNDERMINES THE LIKELIHOOD OF OBTAINING A LESS "BIASED" VENIRE IN ANOTHER VICINAGE.

Defendants point out that the arrests in this case generated extensive attention in the national news outlets. <u>See</u> Bochnak Report, ¶ 3 (noting that the <u>New York Times</u>, the <u>Washington Post</u>, and national weekly news magazines have carried stories about the case, that it was the "top story" on radio and television "talk shows," and that "roughly one in five Americans paid very close attention" to the arrest of the defendants in this case, and 8% "list this as their top story"). Although media scrutiny of the case is doubtlessly higher in the Philadelphia and Trenton areas

than in other parts of the country, this national coverage weighs against transfer.

Additionally, defendants' arguments that they will suffer from generalized prejudice against Muslims and against persons accused of plotting attacks against American soldiers, e.g. MSB 16-17 (describing "Generic Prejudice") provide no support for the motion, as those immutable facts will not be lessened in a different venue.

### 4.    THE PASSAGE OF SIXTEEN MONTHS BETWEEN THE MAY 2007 ARRESTS IN THIS CASE, WHEN PUBLICITY PEAKED, AND THE SEPTEMBER 2008 TRIAL HAS AND WILL CONTINUE TO DIMINISH ANY PREJUDICE.

Although news of the arrests and charges in this case was widely disseminated by local and national media in May 2007, more than sixteen months will have passed since that time and the projected start of the trial in late September, 2008.  Ms. Bochnak contends, without resort to empirical data or citation to supporting studies, that the passage of time since the arrests will not diffuse any prejudice from the initial onslaught of news stories.  Bochnak Report, ¶ 11.

That claim is at odds with relevant caselaw.  As the Supreme Court has recognized, the passage of time is a "highly relevant fact" in assessing the impact of pre-trial publicity.  Patton v. Yount, 467 U.S. 1025, 1035 (1984) (although prejudicial pre-trial publicity was prevalent before the first trial, the effects of

such publicity had abated before the retrial four years later).
See also Murphy v. Florida, 421 U.S. at 802 (noting that
extensive publication of news articles had ceased seven months
before the jury was selected).  The Report's silence about the
volume or frequency of media reports during the past six months
underlines the defendants' failure to sustain their burden of
showing that a fair and impartial jury cannot be selected in
September of 2008.  See Rock v. Zimmerman, 959 F.2d at 1253 (pre-
trial publicity did not deny defendant a fair retrial, where most
of the adverse publicity occurred before defendant's first trial,
and during "the three-month period between the reversal of the
conviction and the start of the second *voir dire,* the region's
two papers carried a total of thirteen articles and the local
radio stations reported an aggregate of eleven news stories");
United States v. Capo, 595 F.2d 1086, 1091 (5th Cir. 1979) (trial
"began almost a year after the occurrence of the alleged
offenses" by which time "local news coverage of the conspiracy
and the murders had subsided substantially . . . . [as] evidenced
by the fact that at voir dire most of the prospective jurors and
many of the jurors had only a vague recollection of the events
that had transpired").

**5.    DEFENDANTS DO NOT PURPORT TO SHOW THAT NEWS REPORTS HAVE DISCLOSED INADMISSIBLE AND PREJUDICIAL EVIDENCE.**

In the very rare instance where a change of venue is justified, an important basis for the transfer is frequently local media reporting about highly inculpatory information that will not be admitted at trial.  But nothing in the defense motion purports to demonstrate that any of the media reports have disclosed highly inculpatory but inadmissible evidence, such as a coerced confession.  Rather, they cite isolated newspaper stories that some persons claimed that the defendants behaved badly (but not criminally) as high school students, worked in a dirty pizza restaurant, racked up numerous motor vehicle tickets, and kept farm animals on their property.  Bochnak Report, ¶¶ 5, 9.  Although Ms. Bochnak rightfully asserts that the defendants "have the right to be tried based only on evidence presented in the courtroom," Bochnak Report, ¶ 9, her analysis mistakenly takes into account supposedly "prejudicial" published information that in all likelihood will be admitted into evidence at trial.  E.g., (a) the Dukas were foreign born Muslims residing illegally in the United States, Bochnak Report, ¶ 9; (b) the defendants engaged in "tactical training" in the Poconos and in Cherry Hill, id.; and (c) the defendants watched jihadist videos.  Id.

Although defendants point to a press conference that took place on May 8, 2007, and a press release issued by the United

23

States Attorney's Office on that day, they fail to demonstrate that the United States engaged in any impropriety that justifies a transfer.[19]  In any event, prejudice need not be presumed even from publicized reports of a defendant's inadmissible confession, much less from a press conference in which there is no claim that any defendant confessed.[20]

### 6.    DEFENDANTS' MOTION IS AT BEST PREMATURE.

To address the kinds of concerns raised in defendants' transfer motion, the Court has fashioned a detailed questionnaire that will be completed by all venire persons in this case.  The

_____

[19]  Defendants do not contend, for instance, that the government's contacts with the media have been improper and in violation of N.J. Local Crim. R. 101.1 ("Extrajudicial Statements In Criminal Proceedings") or New Jersey Rule of Professional Conduct 3.6 (prohibiting an attorney from making an "extrajudicial statement" that the lawyer "knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding").

[20]  See Mu'Min v. Virginia, 500 U.S. 415 (1991); Patton v. Yount, 467 U.S. 1025 (1984).  In Patton, the Supreme Court refused to presume prejudice even though "publicity revealed Yount's prior conviction for murder, his confession, and his prior plea of temporary insanity, information not admitted into evidence at trial." 467 U.S. at 1029.   In Mu'Min, the Court held that the jury was impartial despite damaging pretrial publicity, including "indications that Mu'Min had confessed to killing" the victim. 500 U.S. at 418.

Here, by contrast, defendants do not identify a single news story identifying any prior convictions of any of the defendants, or claiming that any of the defendants has ever admitted that he is guilty of any of the charged crimes in this case.  Although defendants point to newspaper stories about Eljvir's post-arrest letter describing "jihad," that letter is properly admissible against Eljvir, as demonstrated in Point A of the United States Opposition to Defendants' *In Limine* Motions.

Case 1:07-cr-00459-RBK    Document 189    Filed 07/18/2008    Page 30 of 37

questionnaire is designed to root out precisely the kinds of biases that defendants and Ms. Bochnak assume have irremediably infected the venire persons.[3]

_____

[3] For instance, the questionnaire seeks information about whether a prospective juror:

Case 1:07-cr-00459-RBK    Document 189    Filed 07/18/2008    Page 31 of 37

_____

[21](...continued)

(continued...)

Once the results of the questionnaire have been tabulated, this Court will be in a far better position than it is now to determine whether and to what extent the publicity surrounding this case may have influenced the views of potential jurors. Because defendants face a very high burden of demonstrating

_____

[31](...continued)

"presumed prejudice" before *voir dire* begins, the results of the questionnaires may dispel any notion that they have satisfied their burden.  See United States v. Faul, 748 F.2d 1204, 1213 (8th Cir. 1984) (50%  rate of bias was not sufficient to presume prejudice); Martin v. Warden, Huntingdon State Correctional Inst., 653 F.2d 799, 812 (3d Cir. 1981) (25% rate was not sufficient); cf. Irvin v. Dowd, 366 U.S. at 727 (prejudice shown where 90% of prospective jurors thought the defendant was guilty).

Finally, the *voir dire* itself will provide the best possible evidence of potential prejudice.  See Rock v. Zimmerman, 959 F.2d at 1253-54 ("the transcript of the *voir dire* examination retrospectively confirms that community sentiment did not 'utterly corrupt' the trial atmosphere," where "70% of those questioned had not formed an opinion as to Rock's guilt" and of that group, "only six percent said that they could not set their impressions aside and render a verdict based solely on the evidence introduced at trial"); United States Chapin, 515 F.2d 1274, 1288  (D.C. Cir. 1975) ("of the 120 prospective jurors" who were questioned, "22 veniremen had heard of either Chapin or the case," and "[i]n just about every instance, on further questioning the knowledge of the jurors turned out to be simply that the trial was about to take place . . . no one appears to have formed a definite opinion of his guilt or innocence"); see also Lindh, 212 F. Supp. 2d at 549 ("proof of this pudding will

28

be the *voir dire* results; only those prospective jurors found to
be capable of fair and impartial jury service after careful *voir
dire* will be declared eligible to serve as jurors"). "Past
experience provides reasonable assurance that more than a
sufficient number of qualified, impartial jurors will be
identified as a result of the *voir dire* in this case." Id. at
549-50. Only if the Court is unable to secure an impartial jury
following *voir dire* would it be appropriate to grant the transfer
motion. See Campa, 459 F.3d at 1146.[22]

---

[22] The largely neutral publicity generated in this case is
qualitatively incomparable to that which deprived the defendants
of fair trials in cases cited by Shnewer (and others he does not
cite). In Irvin v. Dowd, 366 U.S. 717 (1961), the rural
community in which the trial was held had been subjected to a
barrage of inflammatory publicity immediately prior to trial,
including information on the defendant's prior convictions, his
confession to 24 burglaries and six murders including the one for
which he was tried, and his unaccepted offer to plead guilty in
order to avoid the death sentence. As a result, eight of the
twelve jurors had formed an opinion that the defendant was guilty
before the trial began; some went "so far as to say that it would
take evidence to overcome their belief" in his guilt. 366 U.S.
at 728.

In Rideau v. Louisiana, 373 U.S. 723 (1963), the defendant
had "confessed" under police interrogation to the charged murder.
A 20-minute film of his confession was broadcast three times by a
television station in the community where the crime and the trial
took place. The trial was held in a community where tens of
thousands of people, in a community of 150,000, had seen and
heard the defendant admit his guilt before the cameras.

In Estes v. Texas, 381 U.S. 532 (1965), the trial was
conducted in a circus atmosphere, due in large part to the
intrusions of the press, which was allowed to sit within the bar
of the court and to overrun it with television equipment.
Similarly, in Sheppard v. Maxwell, 384 U.S. 333 (1966), the trial
(continued...)

29

7.    **GIVEN DEFENDANTS' FAILURE TO MEET THEIR BURDEN, TRANSFER OF THIS CASE WOULD WORK AN UNWARRANTED BURDEN ON THE COURT AND THE PROSECUTION.**

Transfer of this case to another vicinage, particularly a vicinage outside this District, would trench upon important considerations, such as:

---

[22](...continued)
was infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for a carnival. See Chapin, 515 F.2d at 1288 (the "results on *voir dire*" in that case were a "far cry from those in any of the cases cited by appellant," including Rideau, Sheppard, and Irvin v. Dowd).

In United States v. Abrahams, 453 F. Supp. 749, 753 (D. Mass. 1978), the court granted transfer where "the record is replete with the kind of prejudicial statements or records of conviction, arrests, or indictments emanating from a public official, zealous attempts by the media to arouse a community on a particular trial, pejorative characterizations of a defendant, and description of evidence against the accused which present the greatest hazards to a fair trial") (internal punctuation omitted). Nothing of that sort is alleged here.

This case is also readily distinguishable from United States v. McVeigh, 918 F. Supp. 1467 (W.D. Okla. 1996), where transfer was granted given the profound impact of the charged crimes -- arising from the bombing of the Murrah Federal Office Building in Oklahoma City, resulting in the murder of 168 people and over $650 million in property loss -- on the district in which the case was filed. Given that unique and extraordinary local impact, all of the parties agreed that a transfer was necessary, id. at 1470, and the court found that "there [was] so great a prejudice against these two defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial at any place fixed by law for holding court in that state." Id. at 1470, 1474. In McVeigh, the courthouse where the case was originally scheduled to be tried sustained collateral damage from the bombing. Id. at 1469. The facts that motivated transfer in McVeigh are absent here.

30

- the trial will proceed expeditiously in this District;

- this District is equipped and prepared to cope with the significant security concerns associated with this case;

- this Court has already undertaken extensive preparations for the electronic presentation of the large volume of exhibits in this case;

- the prosecution team is comprised of attorneys from this district;

- the relevant exhibits are located in this District;

- the defendants are present in this District, and are subject to security measures already in place;

- most of the witnesses are located in or near this District; and

- all of the defense attorneys are based in or around this District.

For those reasons as well, transfer is unwarranted.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny defendants' motion for a change of venue.

<div style="margin-left: 50%;">

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney

/s Norman Gross

By: WILLIAM E. FITZPATRICK
Deputy U.S. Attorney
NORMAN GROSS
MICHAEL HAMMER
Assistant U.S. Attorneys
JOHN VANLONKHUYZEN
Trial Attorney
Counterterrorism Section
U.S. Department of Justice

</div>

Date: July 18, 2008
     Camden, New Jersey

32