IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 13-13769 (RBK)

MOHAMAD IBRAHIM SHNEWER
MOVANT,

v.

UNITED STATES OF AMERICA
RESPONDENT,

EMERGENCY MOTION

RECEIVED
NOV - 8 2022
AT 8:30_____M
WILLIAM T. WALSH
CLERK

## MOTION FOR COMPASSIONATE RELEASE PURSUNAT TO 18 U.S.C. §3582(c)(1)(A) AND THE AMENDED FIRST STEP ACT OF 2018

**COMES NOW**, MOVANT, Mohamad Ibrahim Shnewer, "Shnewer", appearing pro se, and respectfully moves this Honorable Court under 18 U.S.C. §3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement with or without a tracking monitor and a period of Supervised Release. The unprecedented threat of COVID-19 could not have been foreseen at Sentencing, and poses extraordinary risk to Shnewer's health. The virus (**COVID-19, DELTA, OMICRON** and **VARIANTS BA.1, BA.2**) thrive in densely packed populations, and USP Terre Haute is ill-equipped to contain the Pandemic and prevent COVID-19 from becoming **a de facto death sentence** for Shnewer.

Shnewer's diagnosed serious medical conditions make him especially vulnerable to the deadly risk of COVID-19 and its Variants. Allowing Shnewer to finish his sentence at home (with a tracking monitor) is the only prudent response to the Extraordinary and Compelling circumstances created by the Novel Variants.

I. **EXTRAORDINARY AND COMPELLING REASONS WARRANT A REDUCTION IN SHNEWER'S SENTENCE.**

> COVID-19 is a Public Disaster that threatens vulnerable incarcerated persons like Shnewer.

Shnewer's conditions of confinement create an Ideal Environment for the transmission of the **Highly Contagious** disease like OMICRON's Subvariants BA.1 and BA.2. Because inmates live in close quarters, there is an extraordinary high risk of accelerated transmission of BA.2 within jails and prisons like USP Terre Haute. Inmates share small cells, eat together and they use the same bathrooms and sinks. They are never given enough tissue or sufficient hygiene products. Experts believe the number one means in which to stop the Spread of the virus is Social Distancing; well, that is virtually impossible for Mr. Shnewer. In Mr. Shnewer's environment, it is not a matter of [if] he contracts the virus, but rather [when] he contracts it.

## II. THIS COURT HAS AUTHORITY TO REDUCE MR. SHNEWER'S SENTENCE UNDER 18 U.S.C. §3582(c)(1)(A)(i).

The First Step Act was signed into Law on December 21, 2018. Among the law's changes, Congress amended the Compassionate Release provision, 18 U.S.C. §3582(c)(1)(A)(i), to "increas[e] the use and transparency of compassionate release." First Step Act of 2018 §603(b), Pub. L. 115-391, 131 Stat. 5194, 5239 (Dec. 21, 2018). The Law provides the Sentencing Judge with jurisdiction to consider a defense motion for reduction of sentence based on Extraordinary and Compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. §3582(c)(1)(A).

1. The Act provides in pertinent part

   (1) in any case —

   (A) the Court, upon...motion of the defendant after the defendant has fully exhausted all

>administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment**...after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that —
>
>>(i) extraordinary and compelling reason warrant such a reduction...

Preliminary, this motion is properly before this Court because Mr. Shnewer has satisfied §3582(c)(1)(A)'s 30 days lapse provision. Mr. Shnewer submitted a request for reduction in sentence to the warden of his facility more than 30 days ago.

Section 3582(c)(1)(A)(i) authorizes the modification of a sentence of imprisonment if "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," as set out in United States Sentencing Guideline §1B1.13. This Court has discretion to reduce the term of imprisonment imposed in this case based on §3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after consideration of the factors set forth in section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction." Pursuant to the requirement of 28 U.S.C. §994(t), as authorized by 28 U.S.C. §994(a)(2)(C), the Sentencing Commission promulgated a policy statement that sets out the criteria for a reduction in sentencing, which, as set forth in U.S.S.G. §1B1.13 includes, in relevant part:

>(1)(A) extraordinary and compelling reasons warrant the reduction;
>
>(2)    the defendant is not a danger to the safety of any other person or to the community, as provided in in 18 U.S.C. §3142(g); and

(3) the reduction is consistent with this policy statement. Application Note 1(B) provides the following circumstance that qualifies as extraordinary and compelling reasons: "The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."

Hence, it is appropriate for Shnewer to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment — not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

Note: According to the Center for Disease Control and Prevention ("CDC"). COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

    a. Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in nursing homes or long-term care facilities

    b. People of all ages with underlying medical conditions, particularly if not well controlled, including:
- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release.

### III. SHNEWER'S VULNERABILITY TO COVID-19 DUE TO HIS HIGH MEDICAL RISK IS AN EXTRAORDINARY AND COMPELLING REASON THAT WARRANTS A SENTENCE REDUCTION

#### Obesity.

Here because Shnewer has a chronic disease the CDC has identified as a risk factor for COVID-19, specifically obesity, then the Government should agree that he has met the extraordinary and compelling prong.

##### A. Shnewer's Obesity and Status as a Former Smoker During COVID-19 Presents "Extraordinary and Compelling Reasons" that Justify Compassionate Release.

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease cause by the novel coronavirus, as a pandemic.[1] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§1601 et seq.[2] Several days later, the White House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[3]

The Department of Justice has taken the position in litigation that, under present circumstances, an inmate's diagnosis with a medical condition that the

---

[1] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.

[2] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020) available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," New York Times (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage.

CDC has identified as a risk factor for COVID-19, and from which the inmate is not expected to recover, presents an "extraordinary and compelling reason[]" that may warrant compassionate release if other criteria are also met. **United States v. Davis**, 3:13-cr-00045-RLY-CMM (Dkt. 84 p. 6-7), **U.S. v. Garcia**, Gov't Unopposed Motion for Remand, June 8, 2020, 7th Cir. Ct. App., Case no. 20-1716, p.7-8, available at Dkt. 9; see, e.g., **United States v. Pabon**, No. 17-CR-165, 2020 WL 2112265, at *3 (E.D. Pa. May 4, 2020)(noting and agreeing with Government's position)." Here, because Shnewer has a chronic disease that the CDC has identified as a risk factor for COVID-19, specifically obesity, then the Government should agree that he has met the extraordinary and compelling prong.

If the Government does not agree or this Court is not inclined to adopt the DOJ's interpretation of extraordinary and compelling, then it should turn to what other courts have done and turn to the United States Sentencing Commission's policy statement for the BOP on compassionate release, adopted before the passage of the First Step Act. U.S.S.G. §1B1.13 and its accompanying Application Notes. Although §1B1.13 predates the First Step Act, a majority of courts have concluded that §1B1.13 provides helpful, if not dispositive guidance, for understanding the breadth of discretionary authority afforded courts in these cases. See, e.g., **United States v. Schmitt**, 2020 WL 96904, at *3 (N.D. Iowa, Jan. 8, 2020); see, e.g., **United States v. Rodriguez**, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); **United States v. Urkevich**, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); **United States v. Brown**, 411 F.Supp.3d 446, 451 (S.D. Iowa 2019); **United States v. Fox**, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); **United States v. Beck**, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); **United States v. Cantu**, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). U.S.S.G. §1B1.13 states that compassionate release requires "extraordinary and compelling reasons:"

consideration of the factors set forth in §3553(a); and that the petitioner "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." U.S.S.G. §1B1.13

The Application Notes in §1B1.13 provide four categories under which extraordinary and compelling circumstances might exist. Those categories are: (A) Medical Condition of the Defendant; (B) Age of the Defendant; (C) Family Circumstances; and (D) Other Reasons. The first three of categories outline specific criteria that would need to be met, while the fourth, "Other Reasons," provides an open-ended catch-all, allowing a court to use its discretion to assess whether "there exists in the defendant's case an extraordinary and compelling reason other than . . . the reasons described in subdivisions (A) through (C)." U.S.S.G. §1B1.13, cmt. n.1. This provision supports courts' conclusions that those charged with evaluating a compassionate release petition have broad discretion to do so.

Defendant suffers from a number of medical conditions that increase his risk of severe illness from COVID-19. As courts have recognized, persons with such co-morbidities are at even greater risk. See, e.g., **United States v. Beam**, No. 4:17-CR-00463-MHH-GMB-1, 2020 U.S. Dist. LEXIS 233265, at *19-20 (N.D. Ala. Dec. 11, 2020)(obesity, diabetes, and hypertension); **United States v. Hayes**, No. 09-CR-1032, 2020 U.S. Dist. LEXIS 118325, at *6 (N.D. Ill. July 7, 2020)(diabetes, hypertension, and obesity); **United States v. Smith**, No. 15-CR-30039, 2020 U.S. Dist. LEXIS 98878, at *13-14 (C.D. Ill. June 5, 2020)(obesity, hypertension, diabetes, and sleep apnea).

### Furthermore,

With a BMI above 30, Mr. Shnewer is obese. (Mr. Shnewer is 5'11 and his

weight is 299 pounds.) See, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

According to guidance from the Department of Justice, the government concedes that a body mass index (BMI) over 30 constitutes an extraordinary and compelling reason warranting a reduction in sentence. See, **United States v. Steven Cole**, No. 1:18-cr-167 Doc. 95 (D.Md., July 30, 2020)(government letter to court outlining guidance received from the Justice Department). The Department made clear that it continues to follow the CDC's guidance in determining whether an "extraordinary and compelling reason" exists. And according to that guidance, "[h]aving obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19."[4]

A court recently granted compassionate release to a 24-year old where the **only** medical condition identified was obesity (BMI between 31 and 32). **United States v. Mitchell**, No. 17-cr-20652 Doc. 76 (E.D. Mi. July 27, 2020).

In **Mitchell**, the court pointed to a study illustrating that those younger than 60 (like Mr. Shnewer) are still at risk of developing complications from COVID-19. **Id.** at 7-8 (citing Jennifer Lighter, et al. Obesity in Patients Younger than 60 Years is a Risk Factor for COVID-19 Hospital Admission, Clinical Infectious Diseases (Apr. 9, 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333 (last visited July 20, 2020)). That "study found that individuals younger than 60 years old, with a BMI between 30 and 34, were twice as likely to need acute medical care related to COVID-19 than those with a BMI lower than 30. [It also] revealed that individuals under 60 with BMIs between

---

[4] Centers for Disease Control and Prevention, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity (last accessed August 7, 2020).

30 and 34 were 1.8 times more likely to need intensive emergency care than those with BMIs lower than 30." **Id.**[5]

Indeed, an April 2020 study conducted at NYU Lagone Health Center in New York City found that "obesity of patients was the single biggest [chronic] factor, after age, in whether those with COVID-19 had to be admitted to a hospital." **United States v. Delgado**, ____ F.Supp.3d ____, 2020 WL 2464685, at *3 (D. Conn., 2020)(quoting Tiernan Ray, NYU Scientists — Largest US study of COVID-19 finds obesity the single biggest 'chronic' factor in New York City's hospitalizations, ZDNet (Apr. 12, 2020), available at https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-biggest-factor-in-new-york-critical-cases/)). And "the chronic condition with the strongest association with critical illness was obesity, with a substantially higher odds ratio than any cardiovascular or pulmonary disease." **United States v. Jenkins**, ____ F.Supp.3d ____, 2020 WL 2466911 (D. Colo., May 8, 2020)(quoting Petrilli et al., Factors associated with hospitalization and critical illness among 4,103 patients with COVID-19 disease in New York City, medRxiv (Apr. 11, 2020), https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf+html)).

### Central Serous Retinopathy OS. Macular Edema OS. Epiretinal Membrane OU (mild).

Photosensitivity, retinopathy and hyperpigmentation are associated with the use of fairly high dosage of chlopromazine. The appearance of particulate melanin deposits in the lens of the eye is related to the total dose given, and patients

---

[5] **United States v. Jenkins**, 2020 WL 2466911, at *6 (D. Colo., 2020)(citing COVIDView, CDC (May 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html)).

on long term medication should have periodic eye examination. Teratogenicity has not been causually related to these medication, but prudence is indicated particularly in the first trimester of pregnancy. The seizure is lowered but it is safe to use these medications in epileptics who take anticonvulsants.

Mr. Shnewer is at risk of losing his vision, and because of this, he is being monitored by ophthalmology.

### Torn Meniscus.

The meniscus act as shock absorbers within the knee. Injuries to a meniscus can lead to pain, clicking and locking sensation. Most meniscus injuries occur with acute injuries (usually in younger patients) or repeated microtrauma such as squatting or twisting.

This injury impairs Mr. Shnewer's walking ability. He is, however, scheduled to have microscopic surgery to repair the unjury.

### Deformity.

Mr. Shnewer has a diagnosis of what is refered to as hammer toes. This impairs his ability to walk with a normal gait. He is scheduled to have surgery in the future to correct this malidy. He is also now required to wear specially ordered medical shoes for comfort.

### Arthritis.

Mr. Shnewer suffers with joint pain perhaps as a result of his obesity.

## IV. PRELIMINARY STATEMENT

Petitioner was convicted and sentenced to life in prison "after a high-profile, two-and-a-half-month jury trial concerning a plot to attack United States military bases..." **United States v. Duka**, 671 F.3d 329 (3d Cir. 2011). He and four codefendants were convicted of conspiring to murder United States military personnel in violation of 18 U.S.C. §1114 and 1117. **Id.** Petitioner was

also convicted of a firearms offense that was subsequently vacated on appeal. **Id.**

## V. PROCEDURAL BACKGROUND

On May 7, 2007, Petitioner was arrested after an FBI undercover operation, and was subsequently charged with conspiracy to murder members of the United States military in violation of 18 U.S.C. §1117 ("Count 1"); attempt to murder members of the United States military in violation of 18 U.S.C. §1114 ("Count 2"); and attempted possession of firearms in futherance of a crime of violence in violation of 18 U.S.C. §§924(c)(1)(A) & (B)(ii). ("Count 4"). After a jury trial, Petitioner was found guilty of Count 1 and Count 4. Petitioner, along with his codefendants, were acquitted of Count 2.

On April 29, 2008, this Court sentenced Petitioner to life in prison on Count 1, and 360 months to be served consecutively on Count 4. The Third Circuit Court of Appeals affirmed the conviction on Count 1, but reversed the conviction on Count 4. **United States v. Duka**, 671 F.3d 329 (3d Cir. 2011). On remand, Petitioner was again sentenced to life in prison on Count 1.

On June 17, 2013, Petitioner filed a pro se petition for relief under §2255, which challenged both his conviction and sentence. Petitioner's pro se petition raised the following claims: (1) ineffective assistance of counsel for failing to object to the Court's failure to give meaningful consideration to the need to avoid unwarranted sentencing disparities under 18 U.S.C. §3553(a)(6); (2) ineffective assistance of counsel for failing to raise the Court's impermissible use of religious beliefs to sentence him as well as a claim that the Court used his religion to determine the sentence; (3) ineffective assistance of counsel for failing to communicate a plea offer to him or to pursue plea discussions with the government; and (4) all claims raised by his codefendants in their §2255 motions. (Dkt. #1). On December 16, 2013, the government answered Petitioner's §2255 motion, and also moved to dismiss. (Dkt. ##9, 10). On March 5, 2014, Petitioner

filed a pro se memorandum in support of his §2255 motion. (Dkt. #13). On July 15, 2014, the government filed a brief in opposition to Petitioner's §2255 motion. (Dkt. #26).

On December 2, 2015, counsel Molly Armour and Joshua G. Herman sought leave to file their appearances pro hac vice. (Dkt. #33). That leave was granted on December 9, 2015. (Dkt. #34).

On March 7, 2016, this Court entered its order denying all claims for relief set forth in Petitioner's pro se petition. (Dkt. #35, hereinafter, "Order"). The Court also declined to issue a Certificate of Appealability pursuant to 28 U.S.C. §2253(c). **Id.**

It should be noted, Shnewer had no criminal history prior to this case. He graduated high school and worked to earn a ligitimate income. In this case, Shnewer's role was "youthful misadventure", evidence at trial shows Shnewer's <u>reluctance</u> and unwillingness. The FBI and their informant baited Shnewer. They set a trap and entrapped him, evidence at trial supports this fact. The FBI and their informant illegally entrapped Shnewer and persistantly coerced his involvement. In fact, they encouraged and coerced the plan to attack military personnel at Fort Dix military base. Shnewer's "youthful misadventure" and immaturity made it easy for the FBI and their overzealous informant to entrap him. Prior to Shnewer being exploited, he was a normal 22 year old kid working and helping to provide for his close-knit family. Shnewer owned three businesses; he owned a taxicab, a construction business performing general construction, and a halal butcher shop. Additionally, he was a part-time college student.

Mr. Shnewer was just 19 years old when the FBI's informant approached him and not the other way around. And the C.W. was 35 years old.

Prior to trial, Mr. Shnwer was housed in punitive segregation or a Special Housing Unit (SHU) which is 23 hour lock-up. He was forced to endure this from May 7, 2007 until April 29, 2009. This, in and of itself, was torture. Studies have proven long-term segregation is definitely a form of toture, especially for young men.

Mr. Shnewer was then sentenced and housed in another special unit called the Communications Management Unit (CMU). This too was a control unit with extremely limited movement. Again, cruel and unusual treatment immediately following trial.

Additionally, while being subjected to these harsh conditions, Mr. Shnewer was further restricted in the communications with his family and loved ones. For the entire first 10 years of his incarceration, Shnewer was denied contact visits of any sort and restricted to only two phone calls per week. These restrictions were imposed while he was in both the SHU and the CMU, including his pre-trial confinement period.

Mr. Shnewer's health has made his incarceration harsher and more punitive than would otherwise have been the case. This is because federal prisons, as "prime candidates" for the spread of the virus.

See, **United States v. Al Kassar**, 480 F.Supp. 3d 582, 2020 U.S. Dist. LEXIS 150558 2020 WL 4813199, at *1 (S.D.N.Y. August 19, 2020).

> **Federal Bureau of Prisons have had to impose onerous lockdowns and restrictions that have the incarceration of prisoners far more harsher than normal.**

For someone with Shnewer's health profile, the risk of suffering severe health consequences if he contracts COVID-19, coupled to the severe conditions

imposed by the concomitant lockdowns and restrictions that are necessary to ensure Mr. Shnewer's safety, means that "the actual severity of [Shnewer's] sentence as a result of the COVID-19 outbreaks exceeds what the Court anticipated at the time of sentencing."

In this case the evidence of Shnewer's total rehabilitation and family support weighs strongly in favor of a finding of extraordinary and compelling reasons.

It is true, Compassionate Release statute provides that "[r]ehabilitation of the defendant <u>alone</u> shall not be considered an extraordinary and compelling reason." 28 U.S.C. §994(t)(emphasis added). But as the Second Circuit recognized in a recent decision, while rehabilitation "alone" is insufficient, it can "interact with the present coronavirus pandemic" to create an extraordinary and compelling reason for a sentence reduction. **Brooker**, 2020 U.S. App. LEXIS 30605, 2020 WL 5739712, at *9; see also, **United States v. Millan**, 91-CR-685 (LAP) 2020 U.S. Dist. LEXIS 59955, 2020 WL 1674058, at *7(S.D.N.Y. Apr. 6, 2020) ("[Congress'] use of the modifier 'alone' evidences that [it] believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction.").

## VI.  EXCEPTIONAL PROGRAM HISTORY

Mr. Shnewer is now 37 years old. He is a participant in a program called the "Life Connections Program" (LCP) here at USP Terre Haute. It is a residential, multi-faith, restorative justice program. Its mission is to reduce recidivism and bring reconciliation and healing to victims, offenders and their communities. It is to equip participants with necessary skills, tools and attitudes to successfully reintergrate with their families, religious communities and civic communities.

The Life Connections Program focuses on the development of secular, reentry-related skills through the students' religious or philosophical perspectives. LCP addresses your whole life. LCP invites you to learn and practice skills for your physical, mental and emotional and relational health. Learning these skills requires much time and effort. Successful completion of the program requires an intense 18 months, full-time programming in the LCP unit. Many participants find this difficult and uncomfortable; change can be uncomfortable. This program is strictly voluntary. When you choose the LCP, you volunteer for the whole program. When you commit to practicing the skills and endure the discomfort, you will see a personal transformation. LCP will equip you with the skills necessary to help heal yourself, and communities.

Mr. Shnewer committed to the LCP program. He specifically enjoyed the intense "VICTIM IMPACT" classes.

## VII.  DISCIPLINARY HISTORY

Mr. Shnewer does have some disciplinary history. However, they are minor and/or embellished. Shnewer has a clean disciplinary record for the past 3 years. Shnewer has not incurred a single infraction since 2019, no small feat in a closely monitored U.S. Penitentiary.

> See: *United States v. Stephenson*, No. 3:05-CR-00511 2020 U.S. Dist. LEXIS 89591, 2020 WL 2566760 at *7 (S.D. Iowa May 21, 2020); and
>
> See: *Ledezma-Rodriguez*, 2020 U.S. Dist. LEXIS 12539 202 Wl 3971517 at *5 (granting compassionate release and noting that the "Defendant has not incurred a single disciplinary infraction since 2014, no small feat in a closely monitored federal prison.")

Prior to being entrapped by the FBI and their informant, Shnewer was in no way, shape, or form a criminal. He comes from a loving and caring family. His parents raised him to be a righteous young man. He is the oldest and only son of six children. He has five sisters.

### VIII. HOME PLAN

Mr. Shnewer plans to return home to Pennsylvania to reside with his parents and sisters. His sisters are Inas [609-502-3827] and the other sister is Ayat [856-426-3106]. He will live with his parents. His father is Ibrahim [215-768-1677] and his mother is Faten Shnewer. He will reside at:

> Faten Shnewer
> 301 Carmella CT
> King of Prussia, PA 19406

### IX. EMPLOYMENT

Mr. Shnewer will be employed by his father, Ibrahim Shnewer, who owns a taxi cab service in Philadelphia, Pennsylvania.

Mr. Shnewer has an extinsive work history. He has been self-employed for several years. One of the businesses he owned is a construction company. He has an interest to rebuild that company. He is very eager to get back to work so that he can provide for his parents and sisters. His mother is in her 60's and his father is in his 70's. He plans to take care of them now that they are older.

## CONCLUSION

For all of the above reasons, Mr. Shnewer prays this Honorable Court will grant his Motion for Compassionate Release and grant one of the following:

(1) Immediate release with a term of strict Supervised Release; or

(2) Immediate release with a term of Supervised Release and a GPS tracking device; and

(3) the Court should conclude that a more modest reduction to a term of 30 years imprisonment, to be followed by a lifetime of Supervised Release is warranted by the above-described extraordinary and compelling circumstances as appropriate, in light of the Section 3553(a) factors; and

(4) Finally, perhaps the Court would consider deportation as a final option for release.

Submitted on this __13__ day of October 2022.

Respectfully Submitted,

MOHAMAD IBRAHIM SHNEWER #61283-066
CASE NO. 13-13769 (RBK)
USP TERRE HAUTE
P. O. BOX 33
TERRE HAUTE, IN. 47808

## CERTIFICATE OF SERVICE

I, Mohamad Ibrahim Shnewer, hereby certify that on this day a true and correct copy of the attached and foregoing MOTION was placed in the mailbox with proper postage attached at the prison for delivery to the U.S. Attorney's Office addressed as follows:

> U.S. ATTORNEY'S OFFICE
> 401 MARKET ST.
> U.S. COURTHOUSE 4TH
> CAMDEN, NJ. 08102

Submitted this __13__ day of October 2022.

Respectfully Submitted,

MOHAMAD IBRAHIM SHNEWER #61283-066
CASE NO. 13-13769 (RBK)
USP TERRE HAUTE
P. O. BOX 33
TERRE HAUTE, IN. 47808